IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SARA C. DEBORD,

        Plaintiff,

v.                         Case No. 10-4055-SAC

MERCY HEALTH SYSTEM OF KANSAS, INC.,
and LEONARD WEAVER,

        Defendants.

**MEMORANDUM AND ORDER**

This case comes before the Court on the following motions for summary judgment: defendant Mercy Health System of Kansas' (Mercy) motion for summary judgment on Plaintiff Sara DeBord's sexual harassment and retaliation claims; defendant Leonard Weaver's motion for summary judgment on Plaintiff's assault and battery claim; and Plaintiff's motion for summary judgment on Weaver's counterclaim for defamation.

**I. Summary Judgment Standard**

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law. *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992). If this burden is met, the non-movant must set forth specific facts which would be admissible as evidence from which a rational fact finder could find in the non-movant's favor. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th

Cir. 1998). The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986).

In applying this standard, all inferences arising from the record must be drawn in favor of the nonmovant. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). Credibility determinations and the weighing of the evidence are jury functions, not those of a judge. *Id.* at 1216. Nevertheless, "the nonmovant must establish, at a minimum, 'an inference of the existence of each element essential to [her] case.' " *Croy v. COBE Laboratories, Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).

## II. Facts

The relevant and admissible facts, construed in the light most favorable to the Plaintiff follow. Additional facts are set forth in the Court's analysis of the arguments.

Plaintiff worked in Mercy's radiology department in Independence, Kansas from March 19, 2004 to July 13, 2009, when she was terminated.

2

She reported directly to Weaver, who was the director of radiology from 1996 until October 2010, when he chose to step down from that position.

Weaver has unusually cold hands and would often say to Plaintiff and her co-workers "feel my cold hands," then touch the employees' upper arms or the back of their necks. Responses to this practice varied. One employee told Weaver "don't touch me." Another asked him to keep rubbing, while several said, "your hands are cold, get them off me." Plaintiff's response was to pull away. Weaver would sometimes rub Plaintiff's back, and she would tell him "Stop, that hurts," although it didn't hurt. Weaver touched Plaintiff approximately three times a week. Plaintiff never contacted administration to report Weaver's touching, and Plaintiff knows of no co-employee who did so during her employment.

On July 6, 2009, Weaver made negative comments to Plaintiff about her work productivity, which upset Plaintiff. Later that day, Weaver went to the room where Plaintiff was working, put his arm around her and said, "You know I didn't mean it." Plaintiff spun away, saying, "You just don't talk to people like that." This event, which the Court refers to as a *hug* for purposes of convenience, is the sole basis for plaintiff's assault and battery claims.

Later that day, because Plaintiff was upset with Weaver, she posted statements about him on her Facebook account. She did so three separate times, during work hours, via her cell phone, stating:

> 1. Sara DeBord loves it when my boss adds an extra $600.00 on my paycheck for hours I didn't even work...awesome!!

3

    2. SB is sooo disappointed...can't believe what a snake my boss is...I know, I know everyone warned me.
    3. ...he adds money on peoples checks if he likes them (I've been one of them)...and he needs to keep his creapy (sic) hands to himself...just an all around d-bag!!

(Ellipses in original).

    Plaintiff and other employees testified that Mr. Weaver had a habit of putting his unusually cold hands on their bare arms or on the back of their necks. When was asked what she meant by her "creepy hands" Facebook comment, Plaintiff stated that it referred to Mr. Weaver's cold hands:

    Q. And in your Facebook posts when you said "creepy hands," were you intending to describe something other than cold hands?
    A. No. Just that it just gave me the creeps. I mean, it was such an everyday thing that it got to where I could be sitting somewhere and he could come into the area and I wouldn't even have to look, my skin would crawl. I just knew he was there.

Plaintiff's depo., p. 198-94.

    Some radiology department employees, including Weaver, became aware of Plaintiff's Facebook posts that same day. That afternoon Weaver took the posts to Eric Ammons, the Director of Human Resources, who was meeting with Plaintiff about an unrelated matter. Ammons asked Plaintiff if she had made the posts, and she denied it. Weaver then brought in his laptop and showed the posts to them. Ammons asked Plaintiff a second time if she had made the posts. Again Plaintiff denied having made them. After Weaver left, Ammons told Plaintiff that he would investigate who made the Facebook posts, as well as her Facebook allegations about Weaver.

On the morning of July 8th, Ammons met with Plaintiff. He told her if she had made the Facebook posts, it would be better for her to admit it. Plaintiff then admitted that she had made the posts, and Ammons responded that he had already discovered that. Ammons then told Plaintiff she was suspended for one day without pay. Plaintiff's suspension form states:

> Work related conduct needing improvement: Failure to conduct yourself in a manner consistent with a high degree of personal integrity and professionalism, which is expected of Mercy coworkers. Engaged in behavior deemed harmful to a fellow co-worker. Supporting details: See attached Facebook documents. During counseling Sara admitted to posting information on Facebook.

Ammons depo., p. 5, Exh. C.

After Ammons informed Plaintiff of her suspension, he asked Plaintiff about the "creepy hands" comment, and Plaintiff replied that Weaver was a "perv." Ammons asked what she meant by that, and Plaintiff replied that Weaver had made comments about her body and would run his hands up inside the arm of her scrubs and down inside the back neck of the scrubs. Ammons asked Plaintiff if she considered that to be sexual harassment, and Plaintiff denied that it was, saying, "No, he is just a pervert." Ammons told Plaintiff that because the hospital takes such matters seriously, he would refer the matter to Lana Brewster, the risk manager.

Ammons also told Plaintiff that he had the call-back papers. Those papers contained the information which would reveal whether Plaintiff's paychecks were incorrect, as she had alleged on Facebook. Later that afternoon, Plaintiff sent five text messages while at work to co-employee

Tena Walsh, including the statements: "Leonard emptied out the drawer where all the call back papers were kept at work. Guilty as charged. To get rid of them." Ammons became aware that Plaintiff was talking about the matter in the department during working hours, and specifically instructed Plaintiff to keep the matter confidential.

The next day, July 9th, Brewster met with Plaintiff at Ammons' request. Brewster thought that Plaintiff's comment about "creepy hands" might indicate sexual harassment. Plaintiff denied having made and wanting to make a formal report of sexual harassment, but said she had made a verbal report to Ammons. Brewster asked Plaintiff to describe Weaver's conduct, beginning with the most recent to the most remote, and Plaintiff did so. Plaintiff told Brewster of other statements of a sexual nature that Weaver had made to her throughout the years. Brewster told Plaintiff to let her know if she had any more problems. Brewster interviewed Weaver and Kim Harris, a long-time radiology department employee, before concluding that Weaver had not violated Mercy's sexual harassment policy.

Four days later, Plaintiff was terminated. Ammons decided to terminate Plaintiff's employment, and John Woodridge, CEO, and Reta Baker, COO, concurred. Ammons believed that Plaintiff had been dishonest in denying that she had made the Facebook posts, in denying that she had made the Facebook posts while at work, in making unfounded accusations against Weaver about her paycheck, and in breaching confidentiality.

Ammons believed that Plaintiff had been disruptive in openly discussing the investigation and in texting on the 8th, after he instructed her to keep the matter confidential. Ammons told Plaintiff she was terminated for disruption, continued texting, and dishonesty. Plaintiff's termination form states that she was terminated for "work related conduct needing improvement: Inappropriate and disruptive Behavior. Dishonest." Dk. 147, Exh. M.

Discovery in this case revealed that in 2007, Plaintiff had in fact been overpaid approximately $475 (not $600) for overtime that she had not worked. This mistake was due to Plaintiff's clock-in error which Weaver failed to catch in his routine review of the records. Ammons had looked at records from 2006, but not from 2007, when investigating Plaintiff's Facebook comments about Weaver, but had found no overpayment. So at the time of Plaintiff's termination, Ammons disbelieved Plaintiff's comment about having been overpaid.

After her termination, Plaintiff sued Mercy for retaliatory termination, and for sexual harassment. Plaintiff sued Weaver for civil assault and battery based on the alleged July 6th hug. Weaver counterclaimed for defamation, based on some statements Plaintiff made on Facebook and in her text messages, and similar statements Plaintiff made orally. The Court first addresses the Plaintiff's Title VII claims against Mercy for retaliation and sexual harassment, then addresses the individual's tort claims.

### III. Retaliation

Plaintiff lacks direct evidence of retaliation, so must meet the three-part test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), to prove retaliation indirectly.

> Under the *McDonnell Douglas*/indirect approach, the plaintiff must first make out a prima facie case of retaliation by showing (1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. If the plaintiff establishes a prima facie case, the employer must then offer a legitimate, nonretaliatory reason for its decision. Finally, once the employer has satisfied this burden of production, the plaintiff must show that the employer's reason is merely a pretext for retaliation.

*Twigg v. Hawker Beechcraft Corp.,* 659 F.3d 987, 998 (10th Cir. 2011) (citations and quotations omitted).

Defendant challenges the first and third elements of the prima facie case, contending that plaintiff has not shown protected opposition[1] or a causal connection. The Court assumes, without deciding, that Plaintiff has made a prima facie case of retaliation. Mercy has offered a legitimate, nonretaliatory reason for its decision – namely, that Plaintiff was terminated for her inappropriate and disruptive behavior and her dishonesty. This shifts the burden to the plaintiff to show that the employer's reasons are merely a pretext for retaliation. Bryant v. Farmers Insurance Exchange, in which this

---

[1] Plaintiff relies, in part, on cases under Title VII's participation clause, rather than the opposition clause. But the pretrial order includes no claim under the participation clause, and alleges only protected opposition. *See* Dk. 141, p. 10, § 6.1 para. 2; id, p. 11, § 6.2 para. 2.

court held that, "As a general rule, an employee must proffer evidence that shows each of the employer's justifications is pretextual." *Bryant v. Farmers Ins. Exchange,* 432 F.3d 1114 (10th Cir. 2005); *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011).

### Pretext

To determine whether a proffered reason for a decision is pretextual, the court examines the facts as they appear to the person making the decision, not as they appear to the plaintiff in her subjective evaluation of the situation. *Luster v. Vilsack*, 667 F.3d 1089, 1093-94 (10th Cir. 2011). "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Id.*

Plaintiff contends that her statements on Facebook and her texts were true. She thus contends that she was not dishonest, and that Mercy's finding that Weaver had not added money to her paycheck was false. The Court recognizes that falsity evidence is useful in retaliation cases as one means of establishing pretext. *Twigg,* 659 F.3d at 1001. But here, the circumstances cannot lead the trier of fact to reasonably infer from the falsity of the explanation that the employer was dissembling to cover up a retaliatory purpose.

The facts show that Ammons believed at the time of Plaintiff's termination that her paychecks were accurate. It was not discovered until

discovery during this lawsuit that Plaintiff had, in fact, been overpaid approximately $475 due to Plaintiff's clock-in error, which Weaver failed to discover in his routine review of the records. At the time of Plaintiff's termination, Ammons had reviewed the call-back logs from 2006, had determined that those paychecks were in the correct amounts, and therefore believed that Plaintiff's statements about her boss having added money to her paycheck were false. Ammons' failure to review the records for 2007 which would have revealed the overpayment, although perhaps erroneous, raises no inference of pretext.

Plaintiff attacks Ammons' belief that Plaintiff had been disruptive in openly discussing the investigation and in texting on the 8th, after Ammons instructed Plaintiff to keep the matter confidential. Plaintiff contends that Ammons did not tell her to keep the matter confidential until after she had sent the texts, making Ammons' statement false. But even assuming that Plaintiff is correct, Plaintiff has not cast any doubt upon the independent reason of given for her termination - dishonesty.

The facts show that Plaintiff made the Facebook posts via her cell phone during work hours; that employees saw and discussed the Facebook posts at work; that Ammons asked Plaintiff about them; and that Plaintiff denied having made those posts. Plaintiff lied to Ammons about that fact twice. Further, it is uncontested that after Ammons told Plaintiff that he had the call-back logs, Plaintiff told other employees that Weaver had taken and

destroyed them. No facts suggest that Ammons did not reasonably or sincerely believe that Plaintiff's acts were inappropriate, disruptive, or dishonest. These acts provided an independent and good faith basis for Plaintiff's termination, even assuming the truth of her Facebook statements about her paycheck and the truth of her version of when Ammons told her to keep the matter confidential.

Plaintiff's excuses for her dishonest acts are immaterial because in this inquiry, her state of mind is irrelevant. Nothing in the record suggests that Ammons did not believe the reasons stated for Plaintiff's termination. No facts suggest that retaliation for Plaintiff's complaints of gender discrimination played a part in the employment decision. *Fye v. Okla. Corp. Comm'n,* 516 F.3d 1217, 1224 (10th Cir. 2008). Instead, Ammons, the primary decisionmaker in Plaintiff's termination, was the very person who had initiated the sexual harassment investigation by referring Plaintiff's vague complaints to the risk manager just the week before. Ammons thought Weaver's conduct was inappropriate, despite Plaintiff's repeated denials to Ammons that she perceived Weaver's acts as sexual harassment. Because no facts justify an inference that Ammons harbored any retaliatory motive, summary judgment is warranted on Plaintiff's claim of retaliation.

**IV. Sexual Harassment — Employer Liability**

Plaintiff contends that Weaver sexually harassed her at work over the course of her employment with Mercy. In support of her hostile work

environment claim, she offers evidence, some of which Mercy contends
should be excluded. Mercy additionally contends that Weaver's acts were not
sufficiently severe or pervasive to constitute sexual harassment, and that in
any event, Mercy cannot be held liable for them. Plaintiff argues that
defendant is liable both vicariously and directly, but raises no alter ego
theory. The Court addresses the issue of employer liability first, without
resolving whether Weaver's alleged harassment of Plaintiff was actionable.

**A. Vicarious liability**

Plaintiff does not contend that Weaver's harassment culminated in her
termination, or in any other tangible employment action.[2] Accordingly, the
*Faragher/Ellerth* defense may be available. The *Faragher/Ellerth* framework
is designed "to accommodate the principle of vicarious liability for harm
caused by misuse of supervisory authority," and to accommodate "Title VII's
equally basic policies of encouraging forethought by employers and saving
action by objecting employees." *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th
Cir. 2011); quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807
(1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764 (1998).

Under the *Faragher/Ellerth* framework, the defendant bears the burden
to show two elements:

> "The defense comprises two necessary elements: (a) that the
> employer exercised reasonable care to prevent and correct promptly
> any sexually harassing behavior, and (b) that the plaintiff employee
> unreasonably failed to take advantage of any preventive or corrective

---

[2] The pretrial order and plaintiff's memo (Dk. 155) contend that harassment
affected the terms and conditions of her employment only, and that
retaliation caused her termination.

opportunities provided by the employer or to avoid harm otherwise."
*Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Ellerth,* 524 U.S. at 765,
118 S.Ct. 2257.

*Helm,* 656 F.3d at 1285. These elements are addressed below.

### 1. Employer's Reasonable Care to Prevent

The record reveals that Mercy implemented a sexual harassment policy
that strictly prohibits sexual harassment, contains a complaint procedure
listing multiple persons to whom harassment may be reported, and includes
an anti-retaliation provision. Mercy distributed the policy to all of its
employees via its employee handbook. Mercy trained its employees on that
policy during employment orientation and during its annual corporate
compliance education program, which it required all employees to attend.
Plaintiff attended the orientation training which included a discussion of the
sexual harassment policy, and received a Power Point presentation each year
from Human Resources. She also completed the corporate compliance
program annually, which provided continuing education on Mercy's sexual
harassment policy. These facts establish, as a matter of law, that Mercy
exercised reasonable care to prevent sexual harassment. *See Helm*, 656
F.3d at 1288-89.

### 2. Employer's Reasonable Care to Correct

The Court next asks whether the employer acted reasonably to remedy
any harassment that occurred, despite the reasonable preventative
measures.

> ... in order "to establish that it took proper action to correct
> harassment, [the defendant] was required to show that it acted
> reasonably promptly on [plaintiff's] complaint when it was given
> proper notice of her allegations as required under its complaint
> procedures." *Frederick,* 246 F.3d at 1314. "The most significant
> immediate measure an employer can take in response to a sexual
> harassment complaint is to launch a prompt investigation to determine
> whether the complaint is justified." *Swenson v. Potter,* 271 F.3d 1184,
> 1192 (9th Cir. 2001); *see also Cerros,* 398 F.3d at 954 ("Our cases
> recognize prompt investigation of the alleged misconduct as a hallmark
> of reasonable corrective action.").

*Helm*, 656 F.3d at 1290. Plaintiff contends that this requirement is not met

because Brewster failed to investigate Plaintiff's allegations of harassment,

and Weaver was not disciplined as a result of Plaintiff's complaint.[3]

Plaintiff's Facebook comments did not constitute "proper notice"

sufficient to trigger defendant's duty to take corrective action. See *Helm*,

656 F.3d at 1290-91, and cases cited therein. But even assuming the

contrary, an adequate investigation was timely begun. Plaintiff's Facebook

posts were made on July 6th, and Brewster's investigation began on July

9th.

Plaintiff's conversation with Ammons on July 6th, viewed in the light

most favorable to the Plaintiff, arguably provided such notice. Three days

later, Mercy's risk manager, whose responsibility it was to investigate

reports of sexual harassment, initiated a meeting with Plaintiff to ask about

sexual harassment. Ammons had asked Brewster to look at the matter, and

---

[3] Plaintiff also contends that this element is not met because Weaver had
harassed many employees since 2001. Plaintiff's argument confounds the
analysis of vicarious and direct liability. *See* Dk. 155, p. 59-61.

because of the "creepy hands" comment, Brewster thought she was looking at a sexual harassment complaint. When Brewster met with Plaintiff, Plaintiff said she had verbalized a complaint to H.R. against Weaver, but did not want to file a formal complaint. Brewster asked Plaintiff to describe Weaver's conduct, beginning with the most recent to the most remote, and Plaintiff did so. Brewster told Plaintiff to let her know if she had any more problems. Brewster also interviewed Weaver, who denied the bulk of Plaintiff's allegations but admitted putting his cold hands on employees. Brewster told Weaver "if anything was going on, to cease." Brewster depo. p. 36-37. After speaking with Plaintiff, Brewster interviewed a long-time radiology department employee, Kim Harris, who did not confirm any hostility or sexual tension in the department. Brewster concluded that Weaver had not violated company policy.

Because the investigation was adequate and did not reveal that Weaver was sexually harassing Plaintiff or other employees, Mercy's failure to discipline Weaver or terminate his employment does not show lack of reasonable care. The Court finds that Mercy acted reasonably and timely to remedy any harassment of which it was aware.

### 3. Plaintiff's Failure to Use Preventive or Corrective Opportunities

The Court next examines whether Mercy has met its burden to show that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm

15

otherwise. "[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Shaw v. AutoZone, Inc.,* 180 F.3d 806, 813 (7th Cir. 1999) (internal quotations omitted). Plaintiff contends that Weaver's sexual harassment of her began in 2004 and continued throughout her employment, but she concedes that she never reported Weaver's acts before July 6, 2009. This delay, if unexplained, is unreasonable, given Plaintiff's awareness of her ability to report harassing conduct.

Plaintiff first argues that her failure to report earlier was reasonable because she had "objective fears of significant retaliation for complaining." Dk. 155, p. 62. But the record fails to show any objective basis for such a fear. Mercy had an anti-retaliation policy, and Plaintiff shows no facts suggesting that this policy was not enforced. For purposes of this affirmative defense, a generalized fear of retaliation simply is not sufficient to explain even "long delays" of two to four months in reporting sexual harassment. *Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1063 (10th Cir. 2009). Here, Plaintiff delayed for approximately five years before she arguably reported Weaver's acts.

Plaintiff also contends that she believed any report would be futile because Mercy "also employs Weaver's wife … who is one of only two surgeons at this small-town hospital." *Id.* But this fact is not part of the

16

record, since it is not included in either party's uncontroverted statement of fact.[4] Even considering that evidence, however, and viewing it in the light most favorable to the Plaintiff, the testimony establishes only that Weaver's wife was employed as one of Mercy's two general surgeons on the date of Plaintiff's deposition. Without showing that Dr. Herrin was employed by Mercy from 2004 through 2009, Plaintiff's futility argument lacks an essential link.

Plaintiff believes that reporting Weaver's conduct would have been useless because if Weaver were terminated, his wife, Dr. Herrin, would leave the hospital, and Mercy would not want to lose her. Depo. Vol. 1, p. 195. But Plaintiff shows no factual basis for speculating that Mercy would ignore a sexual harassment complaint against Weaver, or that Dr. Herring would leave Mercy if Weaver left. Plaintiff admits no one ever told her this would happen, and she provides no factual basis for her belief. "An employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer. *See Lissau,* 159 F.3d at 182." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262 (4th Cir. 2001).

Because Mercy has presented undisputed evidence establishing that it acted reasonably to prevent and to respond to sexual harassment, and that

---

[4] See D. Kan. R. 56.1(b)(2). Plaintiff cites this record in improperly attempting to controvert Defendant's facts, but does not include it in her own statement of material facts.

Plaintiff unreasonably failed to take advantage of its preventive opportunities, Mercy is not vicariously liable for Weaver's acts.

## B. Direct Liability

Plaintiff additionally contends that Mercy is directly liable for its own negligence. An employer may be directly liable if it fails to remedy or prevent a hostile work environment of which management-level employees[5] knew or should have known. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998). To determine whether an employer is liable for negligence in allowing employees to engage in sexual harassment, this court makes two inquiries: "first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment." *Adler*, 144 F.3d at 673.

### 1. Actual Knowledge

Actual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees. *Adler*, 144 F.3d at 673. Plaintiff admits that she did not report the alleged sexual harassment to administration any time before 2009, when Ammons spoke to her about her Facebook posts.

---

[5] Plaintiff does not attempt to show that Weaver was a management-level employee for purposes of direct liability.

In contending that Mercy had actual knowledge of Weaver's acts, Plaintiff points to one event in 2001, before she was hired.[6] Plaintiff believes that a female employee resigned in 2001 because Weaver had touched her with his cold hands, had made negative comments about the Catholic religion, and had asked her if she'd considered artificial insemination. Although evidence of a perpetrator's bad acts toward other employees may sometimes be useful in imputing knowledge to the employer, this is not such an occasion.

The Tenth Circuit requires that such evidence be similar in nature and near in time. A plaintiff may rely on the employer's

> notice of any evidence of sexual harassment by [the harasser] that is similar in nature and near in time to his sexual harassment of [the Plaintiff] in order to raise a genuine issue of material fact as to whether [the employer] knew or should have known of [the harasser's] conduct.

*Hirase-Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 784 (10th Cir. 1995), *abrogated on other grounds as recognized in Zisumbo v. McCleodUSA Telecommunications Services, Inc.*, 154 Fed.Appx. 715 (10th Cir. 2005). In determining whether to consider acts alleged by other employees, the Court looks to "[t]he extent and seriousness of the earlier harassment and the similarity and nearness in time to the later harassment...." *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1147 (10th Cir. 2008), quoting *Hirase-Doi.* But Weaver's harassment of Plaintiff, which allegedly began in 2004, even if

---

[6] The Court assumes, for purposes of this discussion, that evidence of this event is admissible.

similar in nature, is not sufficiently near in time to the 2001 event to raise a triable issue regarding Mercy's actual knowledge of any hostile work environment to which Plaintiff may have been subjected, given the lack of intervening complaints.

## 2. Constructive Knowledge

Plaintiff relies on a constructive knowledge theory in contending that Mercy had notice of the sexually hostile environment "[b]ased solely on the large number of women who were sexually harassed by Weaver…" Dk. 155, p. 59. By this, Plaintiff refers mostly to Weaver's putting his cold hands on co-workers, who never reported that conduct. But only when the acts of harassment are " 'so egregious, numerous, and concentrated as to add up to a campaign of harassment' " will the employer be liable for failure to discover the harassment. *Adler,* 144 F.3d at 675 (quoting *Baker v. Weyerhaeuser Co.,* 903 F.2d 1342, 1346 (10th Cir. 1990)). The Court cannot find constructive knowledge of sexual harassment based solely on the frequency with which Weaver put his cold hands on employees. "[T]o infer employer knowledge from only the level of pervasiveness essential to make out a hostile environment claim would be illogical because if that were the rule, knowledge would be attributed to employers in all cases of hostile work environment founded on pervasiveness." *Ford v. West,* 222 F.3d 767, 776 (10th Cir. 2000). The facts in this case fall short of the egregious

conduct or campaign of harassment necessary to impose constructive knowledge on an employer.

Because no question of material fact has been shown regarding any basis for employer liability, summary judgment is warranted on Plaintiff's sexual harassment claim against Mercy. Where a court disposes of a claim based on the absence of employer liability, it need not resolve, apart from the question of employer liability, the issue of the presence of a hostile work environment. *See Ford,* 222 F.3d 767; *Adler,* 144 F.3d at 672.

## V. Civil Assault and Battery

Defendant Weaver moves for summary judgment on Plaintiff's claim of assault and battery, which is based solely on the hug defendant Weaver allegedly attempted to give plaintiff at work on July 6th, 2009.

## A. Facts

Defendant denies that he ever attempted to hug Plaintiff, but admits that the facts, viewed in the light most favorable to the Plaintiff, show the following:

> On July 6, 2009, plaintiff commented to defendant Weaver that she would be doing mammograms all day and that no one would see her. Defendant Weaver responded, "How's that different from any other day? All you do is sit on your butt in your room." Plaintiff responded, "I have the highest productivity the department." When defendant Weaver disagreed, plaintiff replied, "Are you trying to tell me I'm worthless?" Defendant Weaver responded, "If that's how you want to put it." Plaintiff went to her work area and started crying. A little later, defendant Weaver entered the nuclear medicine room, put his arm around plaintiff, and said, "You know I didn't mean it." Plaintiff

spun away, saying, "You just don't talk to people like that." Plaintiff admits that defendant Weaver "didn't fully complete the hug" due to her evasive actions.

Doc. 155, p. 64.

## B. Intent to Harm

"The gravamen of a civil assault and battery is grounded upon the actor's intention to inflict injury." *Baska v. Scherzer,* 283 Kan. 750, (2007). Defendant Weaver contends that Plaintiff has failed to raise a material question of fact on the element of intent to harm.

Under Kansas law, the tort of assault is defined as "an intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm." *Taiwo v. Vu,* 249 Kan. 585, 596 (1991). *See* PIK Civ.4th 127.01. The tort of battery is defined as "the unprivileged touching or striking of one person by another, done with the intent of bringing about either a contact or an apprehension of contact, that is harmful or offensive." PIK Civ. 4th 127.02.

Both parties rely on the following testimony by Plaintiff, relative to the issue of intent to harm.

> "Q. Do you believe he intended to harm you?
> A. No. I believe he intended to hug me.
> Q. Did you – do you allege that you sustained any damage as a result of the alleged hug?
> A. Humiliation.
> Q. How long did you feel humiliated?
> A. I still feel humiliated.

Plaintiff's depo., Vol. 2, p. 36.

22

To the extent that Plaintiff suggests that humiliation is sufficient harm for purposes of these torts, the Court disagrees. Emotional distress, such as humiliation, does not constitute bodily harm, either under the plain meaning of those terms, or under Kansas law. Instead, Kansas cases consistently distinguish between bodily harm, and emotional and psychological injuries. *See e.g., State v. Reitz*, 239 P.3d 114 (2010); *Lovitt ex rel. Bahr v. Board of County Com'rs of Shawnee County*, 43 Kan.App.2d 4 (2009).

The facts, viewed in the light most favorable to the Plaintiff, do not tend to show that defendant Weaver threatened or attempted to do bodily harm to Plaintiff. *See* PIK 127.01 comment (describing an assault as "an apparently violent attempt, or a willful offer with force or violence, to do corporal injury to another, without the actual doing of the injury threatened, as by lifting the fist or a cane in a threatening manner"); *Taiwo,* 249 Kan. 585. Thus summary judgment in defendant's favor is warranted on the assault claim.

As for the battery claim, Plaintiff contends that no showing of intent to do bodily harm is necessary, since battery includes an unprivileged, intentional touching, which the recipient finds to be offensive. Plaintiff contends that because of Weaver's past acts and comments to her, she considered the hug to be hostile, offensive, and sexual in nature. But it is the actor's intent to harm or offend, not merely the recipient's offense, that must be shown. In order to establish a battery under Kansas law, plaintiff

must show "an unprivileged touching or striking, done with the intent of bringing about either a contact or an apprehension of a contact that is harmful or offensive." *Marten v. Yellow Freight System, Inc.*, 993 F.Supp. 822, 830 (D.Kan. 1998). Plaintiff's tortured construction of the elements of battery ignores that the gravamen of a civil assault and battery, unlike a negligence claim, is grounded upon the actor's intention to inflict injury. *See Stricklin v. Parsons Stockyard Co.*, 192 Kan. 360, 366 (1964); *Murray v. Modoc State Bank*, 181 Kan. 642 (1957); *Hackenberger v. Travelers Mutual Cas. Co.*, 144 Kan. 607, 610, 611 (1936); *Hershey v. Peake,* 115 Kan. 562 (1924). Battery is an intentional tort, and the term "intent," as it is used in the law of torts, denotes that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it. *Baska*, 283 Kan. at 757, citing Restatement (Second) of Torts § 8A (1964).

Nothing in the facts tends to show that Weaver intended to offend or harm Plaintiff by hugging her. When asked whether she believed that defendant Weaver intended to harm her, Plaintiff replied: "No. I believe he intended to hug me." Weaver did not testify about his intent because he denied that the event occurred. No other circumstances of record suggest that defendant Weaver harbored any intent either to harm or to offend Plaintiff by hugging her. Under Plaintiff's version of the facts, it is reasonable to infer that Weaver intended only to console her. Summary judgment in

favor of the defendant is therefore appropriate. *See Stricklin,* 192 Kan. at

366 (1964); *Holdren v. General Motors Corp.*, 31 F.Supp.2d 1279 (D.Kan.

1998).

## VI. Defamation

Plaintiff seeks summary judgment on Weaver's counterclaim against

her for defamation, contending that all statements she made were true and

that none of them harmed Weaver's reputation.

## A. Facts

Defendant Weaver claims that the following four statements by

Plaintiff were false and defamatory:

> 1. Facebook Post on July 6, 2009: "Sara DeBord loves it when my boss
> adds an extra $600.00 on my paycheck for hours I didn't even
> work…awesome!"
> 2. Cellular Phone Text Message to co-worker Tena Walsh on July 8,
> 2009: "Leonard emptied out the drawer where all the call back papers
> were kept at work…Guilty as charged!" "To get rid of them."
> 3. Oral Statement to former co-worker Heather Boss on July 8, 2009:
> "Weaver had destroyed and in fact shredded the callback logs."
> 4. Oral Statement to former co-worker Melissa Stewart in 2009[7]:
> "Weaver took the callback logs from the Radiology Department."

Dk. 141, p. 9; Dk. 139. Weaver believes that these statements falsely

accuse him of two matters: 1) falsifying Plaintiff's time records and

intentionally paying her for time she did not work; and 2) removing the call-

back papers, which would have accurately reflected the time Plaintiff

worked, to hide his guilt.

---

[7] Ms. Stewart testified that plaintiff made this statement in 2010, then
corrected the date to 2009 on her errata sheet.

Under Kansas law, the elements of defamation are: (1) false and defamatory words; (2) communication to a third person; and (3) harm to the reputation of the person defamed. *Droge v. Rempel,* 39 Kan.App 2d 455, 459 (2008). The Court focuses upon Plaintiff's claim that Weaver has failed to show that any of the allegedly defamatory statements caused harm to his reputation.

## B. Harm to Reputation

"[D]amage to one's reputation is the essence and gravamen of an action for defamation." *Gobin v. Globe Publishing Co,* 232 Kan. 1, 6 (1982). Damages recoverable for defamation cannot be presumed but must be proven. *Hall v. Kansas Farm Bureau,* 274 Kan. 263, 276 (2002). "Proof of such damages typically entails showing that persons were deterred from associating with the plaintiff, that the plaintiff's reputation had been lowered in the community, or that the plaintiff's profession suffered." *Ali v. Douglas Cable Communications*, 929 F.Supp. 1362 (D.Kan. 1996). "[T]he plaintiff in an action for defamation must first offer proof of harm to reputation; any claim for mental anguish is "parasitic," and compensable only after damage to reputation has been established." *Gobin,* 232 Kan. at 7. Evidence must permit the jury to determine what plaintiff's true reputation was in the community of his residence, and to determine whether the publication damaged that reputation. *Id.* Injury to one's personal sensitivities is insufficient to show harm to one's reputation. Id.

In this case, the parties agree that as to the third statement, allegedly made by Plaintiff to Heather Boss, Boss has no opinion concerning Weaver's character, other than that he's a nice man. Dk. 145, p. 8, Dk. 154, p. 6. No evidence shows that Plaintiff's statement to Boss about Weaver's destruction and shredding of callback logs damaged Weaver's reputation. Weaver appears to concede as much by his failure to address this matter in his response. Because no evidence provides any basis for a jury to find that this statement damaged Weaver's reputation, this statement is not actionable.

Weaver contends that the other three statements damaged his reputation at work. To meet his burden to show damage to his reputation, Weaver offers testimony that before the statements were made, certain employees thought positively of him, but that after the statements were made, they thought differently. The Court examines this evidence below, focusing on the requisite causal connection.

Tena Walsh, an employee in defendant's radiology department, was a Facebook friend with Plaintiff. She saw Plaintiff's Facebook Post on July 6th, which said: "Sara DeBord loves it when my boss adds an extra $600.00 on my paycheck for hours I didn't even work...awesome!" She also received the following text messages from Plaintiff on July 8th: "Leonard emptied out the drawer where all the call back papers were kept at work...Guilty as charged!" "To get rid of them."

When asked what her opinion was of Weaver before seeing the

Facebook posts, Walsh testified:

> Well, obviously I didn't -- you know, creepy when it comes to
> women. I can honestly say there was (sic) times, as far as him being a
> boss to me, there was good things that happened too. I mean, he
> pushed me to go back and get my schooling and education, so I mean,
> I'll give him credit for that, but this has gone -- this whole line of
> everything, why we're here today has gone on far too long, and
> unfortunately -- I'm allowed to say what I want to say; correct?
> Unfortunately, it took this happening to Sara and her finally doing
> something to pretty much bring this all out for all of us that have ever
> experienced anything that's gone on for all these years, so – and it's
> time he -- it's totally unjustifiable, it's hurt a lot of people, and it's
> bringing out a lot of pain in the past for a lot of us. Me in particular, I
> know.

Walsh depo. p. 45-46.

Walsh was then asked whether her opinion of Weaver had changed

since seeing Plaintiff's Facebook posts and text messages. She replied:

> My opinion for him is -- I assume he just wants this to be done
> and over with. He doesn't – he doesn't deserve to still be employed
> with Mercy as far as I'm concerned. Maybe I don't either. Maybe none
> of us do. But it's really hard to see him now when I do see him, so --
> ... I've known him because I started just a couple months before he
> did, and he's got away with this shit for too long. Got away with this
> stuff for too long.

*Id.*

In short, Walsh stated no opinion about Weaver's reputation. Nothing

in her testimony raises an inference that she believed Weaver was padding

Plaintiff's paycheck, was a thief, or had destroyed company records. Her

comments about Weaver were based her own experiences with or

observations of him, and on what she believed to be Weaver's sexual assault

of her outside of work. Her cited testimony fails to show that Plaintiff's statements may have caused any change in Walsh's opinion about Weaver, if there was any such change.

Angie Cessna was also aware of plaintiff's Facebook posts. Weaver cites Cessna's testimony that before the posts, "everybody probably thought he was a very nice guy," but now Cessna tries to avoid him when she visits his department. Cessna depo., pp. 51, 54, 55, 64. But Cessna's testimony states that the reason she tries to avoid Weaver is because Weaver's own statements make her feel uncomfortable. *Id.*, p. 55. She began avoiding Weaver when he started making strange comments, which was *after* Plaintiff's termination. *Id.,* p. 64.

Further, when asked whether her opinion of Weaver had changed since she became aware of the Facebook posts, Cessna replied:

> No. I find it very funny that — that his character is in question based on a post. I would be more concerned that his character would be in question due to the way he acted and the things he said in the department. That is — I'm laughing. I mean, that is almost comical to me.

Cessna depo. p. 50. As above, the causal element is lacking. Nothing in the cited record provides any basis for a jury to find that plaintiff's Facebook posts about Weaver damaged Cessna's opinion of him.

Eric Ammons, Mercy's CEO and former head of human resources, saw the Facebook posts and texts in the course of his internal investigation about them. He testified that he still considers Weaver to be "a person of honesty,

29

a person of integrity." Ammons depo. p. 58. Ammons does think differently of Weaver after July of 2009, but that is because Weaver had difficulty leading the department and voluntarily stepped down into a staff position. Depo. p. 61-62. Ammons believed that Plaintiff's lawsuit made Weaver an ineffective leader because Weaver is afraid to counsel employees or take action relating to performance issues. *Id.*, p. 62. Nothing in the cited testimony suggests that Ammons' opinion of Weaver changed because of Plaintiff's Facebook posts or texts.

Additionally, Plaintiff's statements would not have lowered Ammons opinion of Weaver unless Ammons believed those statements to be true. But Ammons investigated Plaintiff's Facebook posts about receiving extra money, and concluded they were not true. He also knew that Plaintiff's texts were false in alleging that Weaver had destroyed the call-back logs, since he had those call-back logs in his possession at the time.

Melissa Stewart, a former co-worker of plaintiff's, was a Facebook friend with Plaintiff, but never saw or heard about Plaintiff's post that Weaver had added money to plaintiff's paycheck. She did hear about Plaintiff's Facebook post saying "at least now he'll keep his creepy hands off me." Stewart depo., p. 12-14. Additionally, Plaintiff told her sometime in 2009 that "Weaver took the callback logs from the Radiology Department." But Ms. Stewart was not asked if her opinion of Weaver had changed

30

because of those statements. Instead, Weaver cites the following testimony

as support for claiming damages to his reputation.

> Q. Do you consider Weaver a person of integrity or honesty or
> morality?
> A. No.

Stewart depo., p. 33. No causal connection is made, however, between this

opinion and Plaintiff's allegedly defamatory comments. Instead, the

immediately preceding testimony clarifies that Stewart's opinion was based

Weaver's own acts, not on Plaintiff's comments:

> Q. Okay. What is your opinion of Weaver as a supervisor?
> A. I don't think that he should be in a position to supervise
> employees the way that he – the way that he is now because I feel like
> if you're a supervisor that there's – you should be concerned with
> managing your employees and not trying to be friends with them. I
> think he crosses the line a lot with his employees. He's too worried
> about their personal lives and being friends with them instead of the
> job that he's supposed to be doing.

*Id.*, p. 33.

Weaver also points to the testimony of Kari Dunham, another Mercy

employee. But Dunham testified that she has no idea what Plaintiff

posted on Facebook, has never seen any text messages about Weaver, and

was not aware that Plaintiff sent text messages to Tena Walsh. Although

Dunham stated that her opinion of Weaver had changed, that change was

caused by rumors relating to Plaintiff's accusations of assault. Depo., p.12-

13. Her testimony does not suggest any causal connection between Plaintiff's

allegedly defamatory statements, which do not allege assault, and damage

to Weaver's reputation.

Testimony from Dr. Herrin, Weaver's wife, does not assist his damages claim. She testified that she was aware of her husband's reputation generally at the hospital. She believes he had a good reputation, is respected and well-liked, and that his reputation had not changed since Plaintiff made her Facebook posts or sent her text messages to Tena. Herrin depo. p. 29-32. Weaver told her that he didn't feel like he could be effective as a manager because of the threat from the Plaintiff's lawsuit, and because of Terri's allegations. Herrin depo. p. 34.

The sole remaining admissible testimony[8] offered to show damage to Weaver's reputation is his own testimony. He stated that he felt like he had lost control of his department partly because of Plaintiff's statements, but mostly because of another incident.[9] Weaver depo. p.165. He believes that the following occurred as a result of Plaintiff's Facebook posts: people at work lost respect for him and no longer talked to him as much as they did before; he felt he could no longer effectively manage the radiology department so he chose to step down as its director over a year later; and Terri Wilson was contemptuous to him in September of 2009. Id., p. 168-173, 187-191.

---

[8] The Court disregards all hearsay not shown to be justified by an exception.
[9] Allegedly, when employee Terri Wilson refused Weaver's instruction to do a task, Weaver grabbed her arm and told her to do it. But the citation is to pages of Wilson's deposition (9-10) that are not included in the record. *See* Dk. 155, Wilson depo., including pages 1-4 and 45-48 only.

No facts show that Terri Wilson's acts were due even in part to Plaintiff's statements. In fact, Wilson testified that she has never used Facebook, and no facts show she was aware of Plaintiff's statements about Weaver. Wilson's contemptuousness to Weaver, if any, has not been shown to have been related to the challenged statements made by Plaintiff.

This leaves the sole proof of damage as Weaver's belief that people at work lost respect for him and no longer talk to him as much as they did before. A victim's own observations may be suitable as proof of harm to his reputation for defamation cases in Kansas, see *Moran v. State,* 267 Kan. 583 (1999), but they must raise a reasonable inference that the damage was caused by the plaintiff's statements. Yet Weaver fails to name any person who was aware of Plaintiff's derogatory comments and who talked to him less, and fails to identify any other way in which employees demonstrated any loss of respect for him. "Broad and factually unsupported allegations ... do not support a claim for damages for alleged defamation." *Davis v. Hildyard*, 34 Kan.App.2d 22, 30 (2005) (finding insufficient proof of damages for defamation where physician testified that patients had canceled their appointments).

Summary judgment is warranted on Weaver's claim of defamation for his failure to prove that any of Plaintiff's four statements damaged his reputation. The Court finds it unnecessary to reach other questions, including whether those statements were substantially true.

33

IT IS THEREFORE ORDERED that defendant Mercy Health System of Kansas' (Mercy) motion for summary judgment on Plaintiff's sexual harassment and retaliation claims (Dk. 146) is granted.

IT IS FURTHER ORDERED that defendant Leonard Weaver's motion for summary judgment on Plaintiff's assault and battery claim (Dk. 146) is granted; and that Plaintiff's motion for summary judgment on Weaver's counterclaim for defamation (Dk. 144) is granted.

Dated this 20th day of March, 2012 at Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge